UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

FILED
MAY - 5 2008
Clerk, U.S. District and
Bankruptcy Courts

HAMDY ALEX ABOU-HUSSEIN, PRO SE,

14 Sorento Blvd, Hanahan, SC 29410

    Plaintiff,

VS.

Case: 1:08-cv-00783
Assigned To : Leon, Richard J.
Assign. Date : 5/5/2008
Description: FOIA/Privacy Act

ROBERT GATES, SECRETARY OF DEFENSE,

Office of General Counsel

Department of Defense

1600 Defense Pentagon

Washington, DC 20301-1600

    Defendant.

## COMPLAINT

HAMDY ALEX ABOU-HUSSEIN, Pro Se, Plaintiff in the above-styled cause, with no legal training, sues Defendant, Secretary of Defense, Robert Gates, in person and in his capacity as Head of the Department of Defense of the United States of America.

Plaintiff files this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, 28 U.S.C. § 1346, 42 U.S.C. § 1983, 18 U.S.C. § 1001, and 18 U.S.C. § 241.

Plaintiff has submitted FOIA requests for his own personal records to the Naval Criminal Investigative Services ("NCIS"), and Army Intelligence and Security Command ("INSCOM"). Both NCIS and INSCOM have failed to comply with the requests, and Plaintiff has exhausted all available administrative remedies over 2 years, concluding with final appeal denial from Secretary of the Army and Secretary of the Navy. Thus, Plaintiff brings this claim before the Court for a de novo review and respectfully requests that the Court grant the relief requested herein.

Additionally, Plaintiff contends that he is the victim of criminal libel and conspiracy on rights by agents of organizations under the Department of Defense. Thus, Plaintiff brings this claim before the Court and respectfully requests that the court refer his complaint to the United States Attorney General to investigate any criminal acts committed by government agents.

Specifically, Plaintiff filed a request with NCIS pursuant to FOIA by letter dated November 6, 2006. Plaintiff's initial request sought access to all information pertaining to his own compiled file from an investigation started by NCIS in September 2005 upon request from the Space and Naval Warfare Command ("SPAWAR"), where Plaintiff is assigned to work by the Department of Navy ("DON"). On other tracks, Plaintiff had filed other requests for records with INSCOM, OPM, and DSS, starting May 2006.

Plaintiff pursued his requests and several appeals in order to learn the extent of criminal allegations in his personal records before his EEOC Federal Hearing on February 28, 2007. Plaintiff was denied his

own records, which eroded his ability for a fair discovery, and prejudiced Plaintiff's case. SPAWAR reported espionage allegations to NCIS, and did not turn over any documents concerning these communications when Plaintiff attempted legal discovery for the specific allegations leveled against him, thus hiding the evidence of criminal conspiracy from the Plaintiff.

The EEOC hearing concluded with SPAWAR Commanding Officer ("CO"), Captain Red Hoover, admitting error causing a stigma. However, CO refused to admit the word "patriot" and initiated further persecution. Plaintiff lost his reputation, career, friends, and any hope of raising a family in the United States to lead a normal life in the pursuit of happiness.

Plaintiff, who was once reduced to sleep in his car because of this persecution, fears the push to make him homeless and penniless. Plaintiff asks the court to shorten his ordeal and order the release of all his records, and then it would be the government burden to appeal the ruling in the court of appeals, not to drag the case forever grinding the Plaintiff's life further. Plaintiff fears for his physical safety, and the loss of his freedom if a major terrorist attack happens in the future.

Plaintiff contends that his continuing hold of a National Security Position is his only deterrent against all future attempts to act on the espionage allegations. Plaintiff is in his 5th year without seeing his parents and siblings who live in Egypt. Plaintiff could not risk leaving the protection of the Constitution to return to Egypt, where the State Security interrogated Plaintiff's father after Plaintiff renounced the Egyptian Citizenship. Plaintiff suspects that the government has requested a reading on him from Egyptian State Security, to which terror suspects were previously turned over to bypass Habeas Corpus, and where they are tortured and killed extra judicially. Thus, Plaintiff, who is trapped in a virtual no

man's land, brings this claim before the Court and respectfully asks the court, after examining his records, to declare the Department of Defense responsible for libel, Criminal libel, Conspiracy against Plaintiff's rights, and all harm that may befall the Plaintiff by the government of Egypt.

Plaintiff knows the main cause for the ordeal is his published opinions that Iraq's population percentages are not listed correctly, and now believes that this misrepresentation was intentionally propagated in the build up to the Iraqi war, and that such false numbers are the true WMDs to tear a country apart. Plaintiff suspects that the current administration does not want a Census in Iraq, since it makes it harder to contest the body count of future genocide.

Justice Louis Brandeis said: "When the government becomes a lawbreaker, it breeds contempt for the law." Plaintiff read this inscription on the façade of the Supreme Court: "Equal Justice Under Law", and asks the court to protect him from powerful government agents like any US Citizen.

## Statement of Facts:

**September 2005:**

1. First workday, September 19, 2005, Plaintiff followed instructions to go to have his picture taken at Bldg T-1, the security office, for badge issuance purposes, which is the first step in checking in with SPAWAR as an acquisition management intern leading to a shipbuilding oversight role.

2. Plaintiff was already holding a Final Secret Clearance adjudicated by DoD in February 2004 while he was a Marine Engineer employed by a major defense contractor, Northrop Grumman, thus the investigation was less than 2 years old, and satisfactory to be adjudicated again.

3. Bldg T-1 is on Brig road and sits immediately across the road from the Charleston Navy Consolidated Brig, where several Al Qaeda terrorists were detained at the time.

4. SPAWAR Security Office duties toward Plaintiff were clerical only, and the paperwork was supposed to be forwarded to his organization, the Naval Acquisition Career Center ("NACC"), which is to handle his security clearance application.

5. The Security Manager, Becky Ladisser, a white female with over 20 years of service with the organization, reported to the Security Director that Plaintiff abused her verbally inside her office when they were alone together on Plaintiff's first workday, and that all Security Staff were in rage. The same female recanted that abuse claim during deposition under oath.

6. The Security Office, which has access to DoD Security Clearances' Databases, looked up Plaintiff's past clearance adjudication report.

7. The Security Office leaked disinformation to the workforce, including Plaintiff's branch, claiming that Plaintiff and his ex-wife are involved with Russian Military Intelligence.

8. Plaintiff's ex-wife was a Political Science Professor at Harvard University who visited Russia repeatedly for research, and never held a National Security Position.

9. Plaintiff, who is a Mechanical Engineer not a Computer Scientist, and already a security scare, was selected the highest level of access in the Command, Automated Information Systems ("AIS") level II Access, which rendered his previous investigation unfit to adjudicate his required secret clearance, and mandated the start of another investigation.

14. Over the preceding 5 years, compared to Plaintiff's peers, only two Cryptologists holding Top Secret clearances had AIS III, a much lower level than Plaintiff's AIS II.

**October 2005:**

15. SPAWAR Security Director admitted in writing to targeting the Plaintiff for removal from Federal Service, and circulated the admission in a security memo full of criminal libel.

16. Plaintiff did not know about the memo at the time, but guessed the Russia allegations after FBI and NCIS agents interviewed him in the workplace.

17. Plaintiff reported his daily humiliation to his career manager in Mechanicsburg, PA, who advised him to learn about the EEO process.

18. SPAWAR Security Office refused to issue Plaintiff's Navy ID (CAC), which is needed to access Plaintiff's Navy Network.

19. The Security Director switched Plaintiff's badge from "Alex" to "Hamdy", disregarding his pleadings for his right to select his own call name.

20. Plaintiff complained to EEO Deputy Officer and asked for the intervention of the SPAWAR CO, who is also the EEO Officer and Head Security Officer.

21. Two days after the complaint, Plaintiff was illegally apprehended in Bldg T-1 parking lot in full view of the infamous Navy Brig, led to a closed room with the Security Director attending, told of his removal from government service, and transferred by security guards holding him inside the security truck from his office building in full view of the workforce.

22. Plaintiff did not resist this illegal arrest, and emailed Deputy EEO Officer invoking NO FEAR Act.

23. Plaintiff contacted the Command legal office and requested a gate pass for an attorney to accompany him to his scheduled termination appointment, and the Command Counsel refused to allow the gate pass on the ground of the case being an internal matter.

24. Plaintiff was allowed back to work, only to find his branch was moved to another building.

25. Plaintiff was seated alone in the vacated space.

26. Plaintiff feared his career would end if fired from a National Security Position and lost his final Secret Clearance, his biggest asset. The conspirators had bigger and more sinister plans.

27. Plaintiff was reassigned from Code 09C to Division 61 to work on Counter-Improvised Explosive Devices ("C-IED") integration in Iraq bound Armored Vehicles.

28. Plaintiff was introduced to the Project Manager ("PM"), the son of the Command Director, the Civilian counterpart to the Military CO.

**November 2005:**

29. PM led the Plaintiff to the Armored Vehicle integration facility several miles away on another base, where Plaintiff was tasked to find a solution for an installation issue.

30. Plaintiff walked into the facility with the PM, inspected the vehicles with the PM, and emailed a report with his findings to the PM.

31. SPAWAR reported Plaintiff's unauthorized entry and espionage activity in the facility to collect information on IED Jamming Technology. Plaintiff learned only of this frame-up attempt 2 years later in November 2007 from a copy of a redacted NCIS report.

32. IEDs killed the majority of US troops in Iraq.

33. Plaintiff grew up speaking Arabic, went to Iraq in a contractor support capacity earlier in the same year 2005, and all his work history is recorded on DoD Databases.

34. A DoD employee who is caught collecting C-IED Technology for Iraq's insurgents is a traitor.

35. Treason is punishable by the death penalty.

36. Criminal conspiracy is punishable by 10 years in prison.

37. Government Agents are not immune when committing Criminal Conspiracy and Criminal Libel.

38. The conspirators set the Plaintiff up by assigning him to work alone on IED solution in Armored Vehicles to be sent to theatre in Iraq. The conspirator's attempt for a frame-up may have failed, but the allegations went on the record and leaked to the public destroying his reputation.

39. If enemy's IED detonation signals ever beat our Counter Measures, then Plaintiff is a prime suspect.

40. Plaintiff was moved to division 63, and told to have a fresh start, and that he will be working Psychological Operations ("PSYOP") with the customer being Special Operations Command ("SOCOM") and the target audience being the Middle East.

41. Plaintiff was solicited for fresh ideas by his new supervisor, Ryan Gunst, an ex-Army Intelligence Officer, and assigned to make a short presentation on November 30th to an in-house meeting on Homeland Security.

42. Among presentation slides, Plaintiff briefly argued that the Iraqi population breakdown is not an accurate representation, and the must need for a 2007 Census in Iraq.

43. Plaintiff suggested using wireless portable computers for Biometric data collection with GPS coordinates, and have the data connected with property deeds, his main idea if the US is to pacify Iraq. US Census Bureau was planning similar portable computers for US Census 2010.

**December 2005:**

44. Plaintiff was awarded $150 by his supervisor for the presentation, the first and last presentation and meaningful work he did.

45. Plaintiff was given an office cube inside his new division 63.

46. Plaintiff's supervisor emailed him that USAID has over $ 1 Billion this fiscal year for Iraq's reconstruction, and asked him to come up with a big proposal.

47. Plaintiff's supervisor suggested to him to let go of his EEO complaint against the Security Office.

48. Plaintiff received a call from an EEO Arbitrator, a private self-employed contractor mediating the still informal complaint, who said that something is terribly wrong because CO refused to issue any exonerating statement, the Plaintiff's only demand to drop his complaint.

49. Plaintiff went formal with his EEO complaint.

50. Plaintiff presented his supervisor with a detailed proposal for a Hi-Tech Major Economic Census in Iraq, basing the requirement analysis on his knowledge of the Middle East as a Native Arabic Speaker. Plaintiff argued that the DoD publicized figure of 20% for both Sunni and Kurds' populations is not correct, and could be the seed for a future full blown Civil War, instead of the current low intensity looting and housing evictions, termed violence by the media. Plaintiff used John Locke's "life, liberty, and property" to explain that the conflict is more about property than religion, and that the protection of property rights by compiling an accurate enforceable deeds is the first step to calm both the land owners and landless expatriates, the latter coming to power for the first time.

**January 2006:**

51. Plaintiff was offered, and accepted, to move to SPAWAR Tampa, Florida, to have another fresh start away from the bad reputation. It would be set as a training rotational assignment for the first 4 months, with costs paid for by NACC, after that Plaintiff's position would be permanent working with SOCOM.

**February 2006:**

52. Plaintiff's roommate, a US Navy Submarine Officer, forced him to vacate their joint rental house, and refused to give reasons. Plaintiff had not told anyone about the situation at his workplace.

**March 2006:**

53. First Tampa workday, Plaintiff sat down with his new division Manager, George Spellman, who showed him the Organization Chart to choose his own slot, the lastly mentioned slot was claimed to be a newly created position for Central Command ("CENTCOM") Liaison, in addition to SOCOM duties;

Plaintiff accepted the position enthusiastically and briefed the division manager of his Economic Census proposal for a new approach to end civil war in Iraq.

54. Plaintiff signed a year lease for an apartment in Tampa, FL.

55. The division manager informed him that he had talked with the Command in Charleston, and that Plaintiff cannot work in Tampa because he does not hold a Top Secret Clearance needed to work with SOCOM, and that SPAWAR Security Director has ruled out PSYOP work.

56. Plaintiff inquired about the CENTCOM slot and his proposal, and the division manager told him to submit it to him for review. Plaintiff was told later that the division would not act on this proposal.

57. Plaintiff was isolated from the workforce after the Tampa division manager called him a spy.

**April 2006:**

58. Plaintiff refused SPAWAR Counsel's offer to arrange mediation of his complaint, and insisted either on starting an independent investigation following Federal rules, or he will go to EEOC directly.

**June 2006:**

59. Plaintiff's interim secret clearance, which was granted by NACC, expired. Plaintiff already lost his previous final secret clearance, and was suspecting that more serious allegations were made against him than the sham Russian connection, the only allegation he was questioned about.

**July 2006:**

60. Plaintiff moved back to Charleston, SC, and rented from a house owner who recognized SPAWAR badge as proof of employment, and informed the Plaintiff that he has friends who work there.

61. Plaintiff went back to his division 63, and was placed in a separate office building, bldg 237, which is 5 miles away from his branch in bldg 3147. The branch Supervisor, Ryan Gunst, told Plaintiff that the rest of the branch is moving soon to the off-base building 237 after some renovations are done. Plaintiff was separated from his branch for the next 9 months, where workers publicly labeled him a terrorist.

**August 2006:**

62. Plaintiff was told to vacate his home by the house owner who would not give reasons.

**September 2006:**

63. Under threat of sanction, EEOC ordered SPAWAR to produce Complaint File.

**October 2006:**

64. Plaintiff contacted both the Inspector General of the Navy, South East, and SPAWAR HQ IG; plaintiff offered to sign medical waivers for truth serum and take Polygraphs, and asked the IG to initiate a criminal investigation to resolve the issue. IG cited the ongoing EEO case and refused to investigate.

65. Plaintiff refused -by email- to meet with the SPAWAR legal staff in person, and insisted on having the mandated mediation discussion by email to keep it on the record.

66. SPAWAR Counsel, Michael Roys, changed the wording of Plaintiff's "refusal to meet" email, and submitted a motion to dismiss citing the fraudulent text to the EEOC Administrative Judge ("AJ") as evidence of plaintiff's non-cooperation.

67. Plaintiff caught the fraud and threatened to report it to the American Bar Association.

**December 2006:**

68. Plaintiff, in fear of a possible criminal frame-up, hired a criminal attorney, Michael O'Connell, who represented convicted terrorist Jose Padilla at the nearby Navy Brig, to attend his deposition.

69. Plaintiff hired an employment attorney, Alan Holmes, to depose the other parties.

**January 2007:**

70. Plaintiff's attorney deposed the security staff and other witnesses of Plaintiff's public humiliation. The agency did not turn over any documents in response to discovery regarding the espionage on Armored Vehicles Counter-IEDs, or any other specific espionage or terror allegations.

**February 2007:**

71. Final mediation meeting failed after SPAWAR CO refused to issue any exoneration letter.

72. Hearing was held on Feb. 28, and agreement reached to make the case for Plaintiff's security clearance a separate issue put on hold pending adjudication, which contradicts Navy v. Egan (1988).

**March 2007:**

73. Settlement signed by CO admitting error. CO refused to refer to Plaintiff in the text as patriot.

**April 2007:**

74. Plaintiff's Final Secret Clearance adjudicated favorably.

**May 2007:**

75. Plaintiff is still devitalized and contained, informed branch head that he has a final secret clearance now, and requested to be engaged in branch projects and work with customers.

**June 2007:**

76. The branch head, ex-Army Intelligence Officer, offered Plaintiff to deploy to Iraq to support Armored Vehicles. Plaintiff refused going away from Habeas Corpus.

**July 2007:**

77. Plaintiff solicited his own customer independently, dealing with Cultural and Media Analysis in Middle East, and brought in funds to support his tasks.

**August 2007:**

78. Tampa Tribune published Plaintiff's Op-Ed for the need to conduct a Census in Iraq. SPAWAR CO called Plaintiff's digital desk phone, and hung up when Plaintiff answered.

79. The branch head rejected accepting funds awarded to Plaintiff from his customer, and switched the task into "pass through", and passed slander so that the workplace turned extremely hostile towards Plaintiff.

**September 2007:**

80. Plaintiff emailed SPAWAR CO, requesting an appointment, and exoneration by Chief of Naval Operations ("CNO"). CO did not respond, but the blocked funds for plaintiff were released.

81. Plaintiff scheduled an appointment time slot in 2 days thru CO personal Secretary.

82. Plaintiff's Division Head, Terry Simpson, relayed to plaintiff the CO refusal to meet with him.

83. Office of the General Counsel of the Navy ("OGC") confirmed to Plaintiff that his FOIA appeal fall under their purview because he is a Civilian.

84. OGC surrendered the authority on the case to JAG Corp. Plaintiff objected to being under the authority of JAG because of his civilian status.

**October 2007:**

85. An active Navy Officer was assigned to be Plaintiff's Supervisor and Branch Head, the only Active Military Officer acting as a Branch Head in SPAWAR Charleston.

86. Plaintiff, in isolation and fear of rendition, contacted ACLU and sent them his settlement including the admission of a security error for their safe keeping.

87. Plaintiff made preparations to go on another rotational assignment with SPAWAR San Diego to escape the bad reputation and make a possible fresh start. The division head supported the move.

**November 2007:**

88. Plaintiff emailed CNO FOIA Office that NCIS has not released his records in one year of continuing requests. CNO Office responded it will investigate.

89. NCIS released to Plaintiff a very small portion of redacted records, with reference to the Counter-IEDs espionage incident.

**December 2007:**

90. Plaintiff filed a final appeal to JAG Corps for his complete records, including all relevant National Security Letters ("NSLs"), and informed the appeal officer that criminal acts by government agents may be in these records.

**February 2008:**

91. Plaintiff emailed his Military Branch Head asking for relief from the spy sleeper blackballing following him again to San Diego.

92. JAG Corps, acting on behalf of Secretary of Navy ("SECNAV"), denied the final appeal.

**March 2008:**

93. Plaintiff, in desperation, took leave and visited the offices of all members of both House and Senate Armed Services Committees, and over a week in the Congressional buildings, delivered an appeal for redress and to expunge the record.

94. Plaintiff emailed a congressional aid to make an appointment with Chairman Ike Skelton. Plaintiff's Division Head questioned him about the private appointment, and Plaintiff's doubts were confirmed that his email account is being monitored.

95. Plaintiff was sent to a surprise drug test, even though his position at the time does not require any drug testing. Plaintiff immediately went thru an independent drug test in a different location for fear of tampering with his first sample.

**April 2008:**

96. Plaintiff, the sleeper suspect, is slated to have a Top Secret/Sensitive Compartmented Information ("TS/SCI") Level 4 Clearance, a reminiscent of AIS Level II in 2005.

97. Plaintiff's position is designated a random drug testing position.

## Conclusion:

Although a review of the allegedly applicable statutes and Executive Order quickly reveals that the requested information is not specifically exempt from disclosure, Plaintiff need not demonstrate that the NCIS's excuses are improper. Rather, the NCIS has the burden of establishing that they are indeed applicable -- something the NCIS cannot do. See 5 U.S.C. § 552(a)(4)(B) (burden is on the agency to sustain its action); see also Currie v. I.R.S., 704 F.2d 523 (11th Cir. 1983) (holding there is a presumption of disclosure unless, after a de novo review, the agency has carried its burden of proving the withheld materials are within one of the exemptions); Moorefield v. U.S. Secret Service, 611 F.2d 1021 (5th Cir. 1980), cert. denied, 449 U.S. 909 (holding there is a presumption of disclosure and, unless government proves it falls within a specific statutory exemption, materials must be made available on demand). Therefore, the Plaintiff has a statutory right to the information he has requested and there is no legal basis for the NCIS's refusal to disclose the information to Plaintiff.

The mere conclusory statement by the NCIS that the requested material is exempt from disclosure is insufficient to establish exemptions and the NCIS should be directed to furnish detailed justification for exemption claims including itemized and indexed documents in such a manner as to correlate justifications for refusal to disclose together with actual portions of documents claimed to be exempt, so that the trial judge or a special master appointed by the trial judge might examine the documents and evaluate the agency's contentions of exemption. 5 U.S.C. §§ 522, 18 U.S.C. 3500. A Vaughn Index. See Vaughn v. Rosen 484 F2d. 820, 157 U.S. App DC 340.

An entire document is not exempt merely because an isolated portion should not be disclosed.

Plaintiff did not seek the disclosure of information pertaining to other individuals' backgrounds. Rather, Plaintiff's requests were exclusively limited to identifying and reviewing information transmissions pertaining to him that either has already been disclosed to NCIS by the conspirators, or through various cooperation with other governmental agencies that received other information thru different channels regarding the Plaintiff, neither of which are exempt from disclosure.

Furthermore, it is unacceptable to use the excuse that the requested records are "owned" by another agency, and to send the plaintiff on a "go around" filing requests to every office in the government. If any copies of records pertaining to Plaintiff are kept within the DoD, then Plaintiff is requesting all such records no matter which agency "owns" them.

Gag or suppression orders cannot prevent any DoD Agency from releasing Plaintiff's National Security Letters they have received from any government agency, or they had issued to another agency or within the same agency, since it violates the first and fourth Amendments; see Doe v. Ashcroft, 2004, Doe v. Gonzalez, 2006. Plaintiff's rights for privacy remains constitutionally protected, and the use of knowledge of such letters by the employers within the workforce may be construed as libel.

Plaintiff therefore is requesting all his records up to the date they are turned over to him by court order and to meet these counts as follows:

(I) Copies of all National Security Letters (NSLs) relevant to Plaintiff that were issued by any government agency to any DoD organization, and all NSLs which were issued by a DoD Organization, gag orders not withstanding, Doe v. Gonzalez (2006).

(II) Copies of all records of all communications, in any form, verbal or written, hardcopy or electronic, which mentioned the Plaintiff in any form, that occurred between the Navy command known as SPAWAR Charleston and all other governmental, intelligence and security entities, whether SPAWAR was sending or receiving. This would include but not limited to, all records from the Command Officer, special security officer, and the legal office.

(III) Copies of all records of all communications, in any form, verbal or written, hardcopy or electronic, which mentioned the Plaintiff in any form, that occurred between any DoD organization and all other international, governmental, intelligence and security entities, including Egypt, whether DoD was sending or receiving, including tapes, recordings, or other electronic or paper records of surveillance. Plaintiff seeks only the opportunity to obtain the tapes or copies thereof, transcriptions of the tapes and translations of the transcriptions.

Release or disclosure of this information will not compromise the source or methods of collection nor does Plaintiff seek disclosure of the identity of any involved persons.

WHEREFORE, Plaintiff respectfully requests that the Court grant the relief requested above and,

(IV) Find that Plaintiff has substantially prevailed in this action;

(V) award Plaintiff its fees and costs pursuant to 5 U.S.C. § 552 (a)(4)(E); and

(VI) grant such other relief as this Court determines to be proper and just under the circumstances;

(VII) Fine the DoD for everyday of delay on turning over Plaintiff's Records, including his relevant National Security Letters, for the amount of $5000 a day for the first month, $50,000 a day for the second month, and $500,000 per day hereafter.

                          SINCERELY,

                          HAMDY ALEX ABOU-HUSSEIN, pro se,

                          14 Sorento Blvd, Hanahan, SC 29410

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

**I (a) PLAINTIFFS** Hamdy A. or Abou-Hussein

**DEFENDANTS** Hon. Robert Gates Sec. of Defense

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 88888
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** 11001
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Pro Se, 14 Sorento Blvd., Hanahan SC 29410 — (251) 648-9632

Case: 1:08-cv-00783
Assigned To : Leon, Richard J.
Assign. Date : 5/5/2008
Description: FOIA/Privacy Act

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES
(FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

### ☐ A. Antitrust
☐ 410 Antitrust

### ☐ B. Personal Injury/Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ☐ C. Administrative Agency Review
☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ☐ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ☐ E. General Civil (Other) OR ☒ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Immigration**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus- Alien Detainee
☐ 465 Other Immigration Actions

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)

☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.

☐ 460 Deportation
☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

(3)

| ☐ G. *Habeas Corpus/ 2255*<br><br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ H. *Employment Discrimination*<br><br>☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ I. *FOIA/PRIVACY ACT*<br><br>☒ 895 Freedom of Information Act<br>☒ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ J. *Student Loan*<br><br>☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ☐ K. *Labor/ERISA (non-employment)*<br><br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☒ L. *Other Civil Rights (non-employment)*<br><br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☒ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ M. *Contract*<br><br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ N. *Three-Judge Court*<br><br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ Multi district Litigation   ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 U.S.C. Section 552, Request for Personal Records

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐   **DEMAND $** ___   Check YES only if demanded in complaint   **JURY DEMAND:** ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY** N.E.   (See instruction)   ☐ YES ☒ NO   If yes, please complete related case form.

**DATE** MAY 5, 2008   **SIGNATURE OF ATTORNEY OF RECORD** [signature]  Pro Se Plaintiff

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

\forms\js-44.wpd

Received
MAY -5
Mail Room
Nancy Mayer Whittington,
U.S. District of Columbia